## The American Strawboard Company v. The Chicago & Alton Railroad Company.

1. RAILROADS—*Liability of, for Damages Caused by Fire.*—Under the statutes of this State, proof that property was destroyed by fire communicated from a passing engine, is to be taken as full *prima facie* evidence to charge the railroad company operating the same with negligence; and to rebut the case made by such proof it is incumbent on

American Strawboard Co. v. C. & A. R. R. Co.

the company to show that the engine was at the time equipped with the best known appliances to prevent the escape of fire, was in good repair, and was skillfully and carefully handled.

2. SAME—*Fires Communicated by Locomotives—Contributory Negligence.*—The statute in regard to fires communicated by locomotives was not intended to absolve the owner of property from all care whatever, and confer upon him the right to make such extraordinary use of his land adjoining a railway as that he might, regardless of danger, pile up vast quantities of highly combustible material, liable at any moment to be set on fire by a passing engine, and he himself take no risk; and in this case the court holds that the question whether the plaintiff was guilty of contributory negligence, in stacking a large quantity of straw near a railroad track, was properly submitted to the jury.

3. TRIALS—*Province of the Jury Where the Evidence is Conflicting.*— The question arising in this case as to the relative merits of different methods of preventing the escape of sparks from a locomotive was one of fact, peculiarly within the province of the jury to determine, and it was for them to reconcile the conflicting evidence, if they could, and if not, then to give credence where they thought it properly belonged.

Trespass on the Case, for damage caused by fire. Error to the Circuit Court of Will County; the Hon. CHARLES BLANCHARD, Judge, presiding. Heard in this court at the December term, 1897. Affirmed. Opinion filed May 23, 1898.

HILL, HAVEN & HILL, attorneys for plaintiff in error; JONES & LUSK, of counsel.

When a fire is started by sparks from a locomotive engine, while upon or passing along any railroad, the fact that such fire is so communicated is to be taken as full *prima facie* evidence to charge the company with negligence. Par. 123, Chap. 114, R. S., title, Railroads; Louisville, E. & St. L. Con. R. R. Co. v. Spencer, 47 Ill. App. 503; Chicago & E. I. R. R. Co. v. Goyette, 133 Ill. 27; Chicago & A. R. R. v. Quaintance, 58 Ill. 393; Chicago & A. R. R. Co. v. Clampit, 63 Ill. 95.

When plaintiff has established a *prima facie* case by proving that the fire was communicated by sparks from the engine of defendant, to rebut the presumption of negligence arising from the proof of that fact, it is necessary that defendant show that the engine was at the time equipped with the best or most approved appliances to prevent the escape of fire, that it was in good repair, and skillfully and

carefully handled at the time of the fire. Forest Glen Brick Co. v. Chicago, M. & St. P. Ry. Co., 33 Ill. App. 574.

The burden is on the defendant to show that the engine was properly constructed, in good repair and operated with due care. Spaulding v. Chicago & N. W. Ry. Co., 33 Wis. 582; Chicago & N. W. Ry. Co. v. McCahill, 56 Ill. 28; Am. & Eng. Enc. of Law, Vol. 8, page 5; Bishop on Non-contract Law, Sec. 1027; Chicago & A. R. R. Co. v. Clampit, 63 Ill. 95.

The law holds railroad companies to the exercise of a very high degree of care and skill in the use of the most effective appliances to prevent the emission of sparks from engines. Gulf, etc., Ry. Co. v. Benson, 69 Texas, 407; Toledo, W. & W. Ry. v. Larmon, 67 Ill. 68; Chicago & A. R. Co. v. Clampit, 63 Ill. 95; Louisville, E. & St. L. Con. R. R. Co. v. Spencer, 47 Ill. App. 503; Louisville, E. & St. L. Con. R. R. Co. v. Black, 54 Ill. App. 82.

A railroad company is bound to use more care and caution in running a train when the wind is blowing, than in ordinary weather. Elliott on Railroads, Sec. 1228; Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U. S. 469; Grand Trunk R. R. Co. v. Richardson, 91 U. S. 470; Great Western R. R. Co. v. Haworth, 39 Ill. 346; Illinois Central R. R. Co. v. Mills, 42 Ill 407; Chicago & N. W. Ry. Co. v. McCahill, 56 Ill. 28.

It is the duty of companies running their engines close to buildings to use the utmost vigilance and foresight to avoid injury, and to control their engines carefully, to adopt every known safeguard, and to avail themselves from time to time of every approved invention to lessen their danger. Frankfort & Bristol Turnpike Co. v. Philadelphia & T. R. R. Co., 54 Pa. St. 345; Fero v. Buffalo & State Line R. R. Co., 22 N. Y. 209.

The degree of care required is always proportionate to the danger. 1 Thompson on Negligence, 153; Elliott on Railroads, Sec. 1228; Bishop on Non-Contract Law, Sec. 1023; Chicago & N. W. Ry. Co. v. McCahill, 56 Ill. 28; Diamond v. Northern Pacific Ry. Co., 6 Mont. 580; John-

son v. Chicago, etc., Ry. Co., 31 Minn. 57; Pittsburg, etc., R. R. Co. v. Noel, 77 Ind. 116.

It is not necessary to aver that plaintiff was in the exercise of due care. 5 Ency. of Pleading and Practice, 1; Consolidated Coal Co. v. Wombacher, 134 Ill. 63; Chicago & E. I. R. R. Co. v. Hines, 33 Ill. App. 271.

All unnecessary averments may be rejected as surplusage. Campbell v. Missouri Pacific Ry. Co., 121 Mo. 340; Weber v. Winona & St. P. R. R. Co., 65 N. W. Rep. 93; Chicago West Division Ry. Co. v. Mills, 105 Ill. 67.

Plaintiff was not guilty of negligence. Par. 123, Ch. 114, R. S., title, Railroads (S. & C. Statutes); Elliott on Railroads, Sec. 1238; Cincinnati, etc., R. Co. v. Barker, 94 Ky. 71; Fero v. Buffalo & State Line R. R. Co., 22 N. Y. 209; Toledo, St. L. & K. C. R .R. Co. v. Kingman, 49 Ill. App. 43.

GEORGE S. HOUSE, attorney for defendant in error.

MR. PRESIDING JUSTICE CRABTREE DELIVERED THE OPINION OF THE COURT.

This was an action on the case by plaintiff in error against defendant in error, to recover damages for the destruction by fire, of 3,476 tons of baled straw, and a straw stacker, which straw was stacked in close proximity to a switch track operated by defendant in error at Lockport in said Will county. It is claimed that the fire which consumed this property was communicated from one of defendant in error's passing engines engaged in hauling cars upon said switch track. The defense was that the engine was properly equipped with the best known appliances to prevent the escape of sparks, and was properly handled.

The case was tried by a jury which returned a verdict in favor of defendant in error. A motion for new trial was overruled by the court and judgment rendered against plaintiff in error for costs. To reverse this judgment a writ of error is prosecuted to this court.

The assignments of error challenge the correctness of the court's rulings upon the admission and rejection of evidence,

the giving of instructions on behalf of defendant in error, and in refusing to set aside the verdict and grant a new trial.   After a patient and careful consideration of all these questions a majority of the court hold that the objections are not well taken, and that the record is substantially free from error.

As shown by the evidence, the facts of the case, briefly stated, are as follows :   The fire complained of occurred on March 25, 1895.   At that time, and for several years prior thereto, defendant in error owned and operated various switch tracks in the village of Lockport, which were constructed and laid down under the authority of certain ordinances of said village, and which ran from a point on the main line of defendant in error's railway to the several industries carried on in said village, such switch tracks constituting what is designated upon the plats put in evidence as a " Y."

The " Y " and the switch tracks in question were located upon and crossed certain lands granted by the general government to the State of Illinois to aid in the construction of the Illinois and Michigan Canal, and which were, in 1848, platted and laid out by the canal trustees into village lots, blocks and streets, which lots have been conveyed by reference to such plat.   On this plat appears a street called " Daviess street," and one of the switch tracks referred to, according to the " Whitley Plat " put in evidence, ran on the west line of this street immediately west of and opposite block 127, for a short distance, and thence diverged northwesterly to the paper mill in one direction and southwesterly to the wire mill in another.

For many years prior to the fire, Norton & Co. had owned and operated a paper mill in Lockport, and on September 13, 1882, they leased the same to the Lockport Paper Company, which, on July 1, 1889, assigned its lease to plaintiff in error with the consent of Norton & Co.

This lease does not appear to cover any part of block 127, on a part of which the straw in question was stacked at the time of the fire, but by a deed put in evidence by de-

fendant in error, it does appear that on June 9, 1891, the canal trustees conveyed to plaintiff in error lots 2, 3, 6 and 7 of said block 127, being the west half of said block, lying immediately east of and abutting upon the east line of said Daviess street. In said deed no reference whatever is made to said street.

The straw which was consumed by the fire consisted of a tier of stacks, ten in number, located partly in Daviess street, and partly on the adjoining lots in block 127, and it appears from the evidence that the same ground had been used for the purpose of stacking straw thereon by Norton & Co. and their successors, including plaintiff in error, for a period of about twenty years. It is claimed that Daviess street at the point where the straw was stacked has been for many years practically abandoned by the public as a traveled street, a new road having been acquired across the west half of block 127, as shown by the dotted lines appearing on the Whitley plat.

On the morning of the fire one of defendant in error's engines was engaged in switching in the yards, in charge of its servants, at a time when there was a high wind blowing from the west, and immediately after the engine had passed over a track thirty feet westerly from the nearest straw stack the latter was discovered to be on fire, and although all due efforts were made to prevent it, the entire ten stacks, containing 3,476 tons of baled straw worth $4.35 per ton, were entirely consumed by the fire, and a straw stacker upon the ground was likewise destroyed.

There seems to be no dispute about the fact that the fire was communicated by the passing engine, the principal point of contention being as to whether the engine was properly equipped with the best known appliances to prevent the escape of fire, and also as to whether or not it was properly handled. And it is insisted by defendant in error, that by stacking such a large amount of highly combustible material in close proximity to the switch tracks, known to be operated daily, plaintiff in error was guilty of such contributory negligence as prevents and bars a recovery in this case.

It is clear that under the act of March 29, 1869, proof that property is destroyed by fire communicated from a passing engine, is to be taken as full *prima facie* evidence to charge the railroad company operating the same with negligence.   3 Starr & Curtis (2d Ed.), p. 3294.

To rebut the case made by such proof it is incumbent upon the railroad company to show that the engine was, at the time, equipped with the best known appliances to prevent the escape of fire, was in good repair, and was skillfully and carefully handled.   Chicago & A. R. R. Co. v. Quaintance, 58 Ill. 389.

The engine which set the fire complained of was equipped with what is called the " Diamond Stack " for the purpose of preventing the escape of fire therefrom.   As to this there is no dispute, but it is insisted by plaintiff in error that the Diamond Stack is not the best known appliance now in use as a spark arrester on locomotive engines, and that a better and safer one is what is known as the " Extension Front."   We do not deem it necessary to go into an extended description of these different appliances nor a discussion of their respective merits.   Considerable evidence was taken as to their relative value, experts on both sides giving their opinion as to the merits of the two systems, and it is unfortunate that these opinions are far from being harmonious, but such is the case.   From the whole evidence it seems to be left somewhat doubtful as to which is the better appliance, under all conditions, and it would appear that what is the best mode of preventing the escape of fire from locomotive engines is still a matter of doubt and experiment, no two experts entirely agreeing upon the subject.   One thing, however, appears certain, and that is, no device has ever yet been invented or applied which will, under all circumstances, entirely prevent the escape of fire and sparks from moving engines when drawing a loaded train.   In this case the proofs are clear that the engine, and the appliance to prevent the escape of fire, such as it was, was in good repair at the time when it is alleged the fire was communicated to the property destroyed.   The

jury saw the witnesses and heard them testify; they saw the models and drawings of the respective appliances; and having found against plaintiff in error on this issue we see no sufficient reason for saying they came to a wrong conclusion. It was for the jury to reconcile the conflicting evidence if they could, and if not, then to give credence where they thought it properly belonged. The question submitted was one of fact, peculiarly within the province of the jury to determine.

Upon the question as to whether the engine was carefully and skillfully handled, the affirmative evidence is all one way. Numerous witnesses testify to the competency and carefulness of the engineer and fireman, and those who saw the engine at work at the time the fire was set, say it was as carefully handled as it ever was. True, it appears that at the time the engine passed the straw stacks a high wind was blowing from the west and from the engine toward the straw, and that the engineer was compelled to use considerable steam to draw out his load, but he testifies he only used such steam as was necessary to do the work, and while it is strongly urged that under the circumstances, and because of the high wind, greater care was required than would have been necessary on a still day, we can not say the evidence shows an improper or careless handling of the engine. It may be it would have been less dangerous to have passed and repassed these straw stacks several different times, by dividing the train and hauling out the cars two or three at a time, than it was to pass by once in hauling the whole train, but it is not clearly apparent to us that such would have been the fact. The claim that the engine was improperly handled, we think, rests upon inference and not upon evidence, and we are not prepared to say the finding of the jury was wrong upon this question.

While it is assigned for error that the court admitted improper evidence on the part of defendant, and refused proper evidence offered by the plaintiff, yet as no point is made on these assignments of error in the argument of counsel for plaintiff in error, the objections must be considered as waived, and need not be further discussed.

At the close of all the evidence in the case, plaintiff in error asked the court to instruct the jury to find a verdict in its favor, which the court refused to do, and this is assigned for error. We think the instruction was properly refused. In view of the questions of fact involved, and the contradictory nature of the evidence in relation thereto, it would have been clearly improper for the court to have given the instructions asked. It was right and proper that the questions of fact should be submitted to the jury as was done.

Complaint is made that the court erred in refusing to give instruction numbered five, asked by plaintiff in error. The purport of this instruction was that possession of real estate was *prima facie* evidence of ownership, and if the jury believed from the evidence that the ground where the straw stacks stood at the time of the fire had been in the actual and exclusive possession of the plaintiff for some years prior thereto, and that during all that time the plaintiff exercised acts of ownership over and upon the same, then such possession was *prima facie* evidence of ownership in the plaintiff of the property on which the straw was stacked at the time of the fire.

We think there was no error in refusing the instruction. As we have seen, a large part of the straw in question was stacked in and upon what appears on the plat as Daviess street. The question of ownership in that street was not properly involved in the case, and to give this instruction to the jury could only have been misleading, in submitting an issue not before them.

While the assignments of error challenge the action of the court in giving a number of instructions at the instance of defendant below, the argument only complains of and discusses two, being the sixteenth and seventeenth. We do not think the sixteenth instruction is fairly open to the criticism placed upon it by plaintiff in error. It certainly does not in terms pretend to tell the jury that any different appliance, or one more unsafe, may be used upon a switch engine than one engaged in any other use to which engines

may be put in conducting railroad business, although this is the construction placed upon it by counsel for plaintiff in error. Nor do we see that the mind of the ordinary juror would naturally have understood it as intending so to inform them. After a careful consideration and analysis of the instruction, we are of the opinion there was no error in giving it.

Instruction No. 17 complained of, is as follows:

"17. The jury are further instructed that, in this action, the burden of proof is upon the plaintiff to show, not only that the defendant was guilty of negligence, but that it, the plaintiff itself, was not guilty of negligence or carelessness."

We think the question of contributory negligence was fairly involved in the case and that there was no error in giving this instruction. In four of the five counts of its declaration, plaintiff in error averred due care on its part to prevent the destruction of its property by fire, and while under the statute above referred to, a party is not to be charged with negligence because he uses his property in the same manner in which he would have had the right to use it had no railroad been there, yet we think it was not intended by this act of the legislature to absolve the owner of property from all care whatever, and confer upon him the right to make such extraordinary use of his land adjoining a railway, as that he might, regardless of danger, pile up vast quantities of highly combustible material, liable at any moment to be set on fire by a passing engine and he himself take no risk. One might desire for purposes of his own, to erect and maintain a powder house upon his land, for the storing of gunpowder, and if he violated no police regulation of the State, he might have a perfect right to make such use of his property, but no one would contend it was not an act of culpable negligence to locate such a building in the immediate vicinity of a railroad track constantly traversed by passing engines, and it would be unreasonable to hold the railroad company responsible as an insurer of the safety of such a structure.

Our attention has not been called to any decision of our Supreme Court on this precise question since the passage of the act of 1869, nor do we know of any.   The cases of Toledo, W. & W. Ry. Co. v. Larmon, 67 Ill. 68, and Toledo W. & W. Ry. Co. v. Maxfield, 72 Ill. 95, have been cited by counsel for defendant in error in support of his contention that plaintiff in error is chargeable with contributory negligence in this case.   But there is nothing in either of those cases to show when the fire complained of occurred, and hence we can not say they are of controlling force in the case at bar.   We regard the act of 1869 as being remedial in its nature, and intended to relieve the owner of land abutting upon a railroad from the burden of keeping his property free and clear of combustible matter in its ordinary use.   On the generality of farms through or near which a railroad passes, it is a natural and common thing for dead grass, dry weeds, stubble or straw to accumulate and become liable to ignition from passing engines, and it would be burdensome to require the owner to clean up these accumulations, at the peril of suffering the loss on account of his own contributory negligence, in case his property was destroyed by fire communicated from a passing engine.   But this is a very different thing from voluntarily piling or stacking an immense quantity of highly combustible matter in immediate proximity to a railroad track, as was done in this case. The evidence shows the stacks to have been so near one of the tracks, that the engineer could pull straws therefrom when leaning out of his cab window, and they were only thirty feet from the track upon which the engine was moving at the time the fire is supposed to have been communicated.   That plaintiff in error was fully aware of the danger and the risks incurred by placing its stacks so near the railroad tracks is evidenced by the fact that it was equipped with hose, pumps and other facilities for extinguishing fires, and kept a watchman constantly in charge of the straw stacks, with buckets filled with water ready for instant use.

Upon a full consideration of this question we are disposed to hold that the question of contributory negligence in this

case was one proper to be submitted to the jury and that the seventeenth instruction was properly given.

This disposes of all the material questions discussed by counsel in argument, and finding no error in the record the judgment must be affirmed.

Judgment affirmed.

MR. JUSTICE DIBELL DELIVERED THE FOLLOWING DISSENTING OPINION:

My examination of this case has brought me to a different conclusion from that reached by the majority of the court and the case seems of sufficient importance to justify a statement of the main reasons why I think the judgment should be reversed and a new trial awarded. .

First. Two counts in the declaration averred that the property when destroyed by the fire in question was situated upon "a certain close of plaintiff in the village of Lockport." Issue was joined on a plea of the general issue to these and other counts. The west end of the west tier of stacks where the fire caught was upon a strip of land marked on the plat "Daviess St." Plaintiff sought to show the continuous use of said strip for many years as a straw stack yard by itself and its predecessors in business, and to establish a title thereto by possession, and thus to prove that the place where the fire caught in its stack was upon its "close" as averred. Defendant offered in evidence the title papers of plaintiff for the evident purpose of showing that plaintiff had no paper or record title to the land where the fire caught—that said strip was not included in its deed or lease. Defendant's counsel argues here, and it may fairly be assumed he argued to the jury, that plaintiff was not the owner of the land on which the west tier of stacks stood, and was not entitled in this case to the rights and immunities extended to an owner in the use of his own land. On this subject plaintiff asked the court to give to the jury the following instruction:

"5. The court instructs the jury that possession of real estate is *prima facie* evidence of ownership, especially where such possession has been exclusive and long-continued, and

if the jury believe from the evidence in this case that the ground where the straw stacks stood at the time of the fire then was and for some years had been in the actual and exclusive possession of the plaintiff, and that during all that time the plaintiff exercised acts of ownership over and upon the same, then such possession was and is *prima facie* evidence of ownership in the plaintiff of the property upon which the straw was stacked at the time of the fire."

The court refused this instruction, and the record presents the question whether such refusal was error.

The proof shows Norton & Co. built a paper mill in 1872 on the west side of the Illinois & Michigan Canal, and a short distance from said mill established a large straw stack yard for the storage of straw purchased to be used in making paper in the mill. The firm had deeds for part but not for all of the land upon which it established said yards. There were many straw stacks kept in said yards, and a large quantity of straw seems to have been constantly kept on hand. The land was so used for a stack yard in connection with the paper mill continuously from 1872 to the time of the fire, March 25, 1895, a period of twenty-three years. In 1882 Norton & Co. leased the mill to the Lockport Paper Company, and it entered into possession of the mill and straw stack yard, and operated both. In 1889 the Lockport Paper Company assigned its lease and all its rights to the American Strawboard Company, and the Strawboard Company entered into possession of the mill and stack yard, and operated both till the fire. In 1891 the American Strawboard Company obtained a deed from the canal commissioners of some of the lots upon which said stack yards had long been located. As before stated, this stack yard was partly upon the land marked "Daviess St." upon the recorded plat. The west end of the west tier of stacks rested upon said strip, and there the fire started. There is no proof Daviess street at the place where this stack yard was located had ever been accepted as a street by the village of Lockport, in which it was situated, nor that the village had ever taken possession of or worked that part of said

strip as a highway, nor that the public had ever traveled that route. Acceptance or user was necessary. Jordan v. City of Chenoa, 166 Ill. 530. On the contrary, the proof shows that the straw stacks in that stack yard had occupied that ground ever since 1872, and that those operating the paper mill and stack yard opened a way for the public east of the west tier of stacks and across lots owned by said parties, and that the public had continuously traveled that route since 1871 or 1872. North of the spillway of the canal the paper mill buildings stood directly upon the line of said so-called Daviess street, and in 1871 a bridge over the spillway was built on the line of said public travel, entirely east of the east line of the strip marked " Daviess St." It is not made clear whether the village built that bridge, but it has kept it in repair for many years.

Defendant denies plaintiff the rights of an owner of said ground because bare possession will not ripen into a title against the State, and because the deed from the canal Commissioners to plaintiff in 1891 was of lots in the subdivision upon the plat of which said strip of land is marked " Daviess St;" and therefore it is said plaintiff should be estopped from denying that said strip is a public street. This is not a controversy between the Strawboard Company and the State, and the question whether the company's possession of this strip of land would give it title thereto against the State is not involved. The village of Lockport represents the State as to streets within its borders, and it has never, so far as appears, sought to open or use Daviess street at this point on the line so marked on the plat, but has recognized a traveled way east thereof, and keeps in repair a bridge on said way. It did grant to defendant the privilege of crossing and running along Daviess street, but the tracks defendant laid pursuant to said permission do not occupy any part of said stack yard. One of said tracks, called the straw track, was purposely laid immediately west of said stack yard in the so-called street to enable it to deliver cars of baled straw to plaintiff at said yard; but the locomotive which caused the fire in

question was not upon said straw track, but upon another track west thereof, leading to the paper mill and to Norton's flour mills, and so the permission given by the village has no bearing upon plaintiff's possession and right to occupy all that part of the strip marked " Daviess St.," which was used by it for a stack yard. The defendant was not a party to the deed from the canal commissioners to plaintiff. When that deed was made plaintiff and its predecessors had been in possession of said stack yard, including the part resting upon said strip, for many years. I am of opinion the taking of said deed had no effect to oust plaintiff of whatever rights it had acquired by long possession of a stack yard upon part of said strip marked " Daviess St." on the plat.

It seems to me, therefore, that the facts appearing in this record constitute plaintiff, as against this defendant, the owner of so much of the land marked " Daviess St." on the plat as plaintiff and its predecessors had thus occupied for a stack yard, including the ground where the stack caught fire. Prior possession of land for not less than twenty years is *prima facie* evidence of title and will authorize a recovery in ejectment or in trespass *quare clausum fregit* against a mere trespasser. Riverside Co. v. Townshend, 120 Ill. 9; Shoup v. Shields, 116 Ill. 488. In McLean v. Farden, 61 Ill. 106, the court held that a party in possession of land is entitled to hold it against all the world except the owner of the paramount title; that a party in possession of land, no matter how acquired, is entitled to maintain his possession against any mere intruder or wrongdoer, and will be deemed and held the true owner thereof till the contrary is made to appear. City of Chicago v. McGraw, 75 Ill. 566; City of Peoria v. Crawl, 28 Ill. App. 154. As plaintiff pleaded this was its close, and defendant by plea denied it, and by argument says plaintiff can not recover because the stack which first caught fire was in a street, I think plaintiff's ownership was a proper subject for instructions. As defendant in this case was a mere wrongdoer, having no rights in the land where the stacks stood, the

long-continued and exclusive possession thereof, with an established business, ought to be sufficient evidence of its ownership for the purposes of this case. As this case was tried I think it was important for plaintiff to have the jury instructed upon the law as laid down in instruction No, 5, and that its refusal was harmful to plaintiff and reversible error. A given instruction alluded to this subject, but it did not state the entire legal proposition contained in instruction No. 5, and which I think plaintiff was entitled to have laid down to the jury, in view of the pleadings and of the position taken by defendant.

Second. The court at the request of defendant gave the following instruction: "17. The jury are further instructed that in this action the burden of proof is upon the plaintiff to show not only that the defendant was guilty of negligence but that the plaintiff itself was not guilty of negligence or carelessness." There were only two respects in which defendant argues there was proof of contributory negligence by the plaintiff, namely, in locating its stacks in the street, and in putting them so near the line of defendant's tracks—about thirty feet from the track on which the engine was when it set the fire. What has already been said as to plaintiff's possession of said stack yard disposes of the claim plaintiff was negligent in locating its stacks in the street. The place was not a street in any sense except that it was so named on an old plat recorded many years ago. The proposition that it was negligence for the plaintiff to locate its stacks thirty feet from defendant's switch track is based upon the assumption that after the track was located plaintiff changed the use of the land and put it to a new, extraordinary and highly dangerous use, with full knowledge of the hazards attending its action. This position, it seems to me, ignores the evidence.

Several witnesses testified that Norton & Co. stacked from the time the paper mill was built right where the stacks in question stood, and that their successors stacked right where Norton & Co. had stacked, and that this place had been so used ever since the mill was built. A contract be-

tween Norton & Co. and the railroad company, made in 1891, after the rights of the Strawboard Company had attached, recites contracts between Norton & Co. and the railroad company, made in 1874, in 1883, and in 1887, under which at some time not stated, a bridge was built across the canal (on the east side of which the main line of the railroad was located) and side tracks were built. These recitals doubtless are not evidence against the Strawboard Company, but they seem to be the only evidence at what date earlier than 1890 these switch tracks were put down. They show it was not earlier than 1874 and that it may have been later. The paper mill was built in 1872. Large room was necessary for the storage of straw in stacks out of which to make paper. The persons who founded the paper mill located the straw stack yard on this land. They and their successors in the business of operating this paper mill have ever since occupied this particular tract of land for that purpose. The land, including the place where the stack stood which first caught fire, was exclusively used for a straw stack yard before the railroad track was located there, and after the track was located there the proprietors of the paper mill simply continued to use the land just as they had done for years before.

Section 1 of the act of 1869 in relation to fires caused by locomotives expressly provides for this case, when it says, " It shall not in any case be considered as negligence on the part of the owner or occupant of the property injured, that he has used the same in the manner, or permitted the same to be used or remain in the condition it would have been used or remained had no railroad passed through or near the property so injured." This owner had its straw stacks at the precise place where its predecessors in business had them before the railroad tracks were put near by; and it has used the place in the same manner, and only in the same manner, that it was used before the railroad tracks were located, and in the same manner it would have been used if no railroad tracks had been located near the property. If defendant's contention is well founded, the effect of its

locating its switch track where it did was to deprive the owners of the paper mill and stack yards of the right to use their property as they had theretofore used it, except under the penalty of being their own insurers against fires which might be set from engines on said tracks by the negligence of the railroad company. It is not shown this land would be useful to plaintiff for any other purpose, nor that it had room enough to have put said stacks remote from the railroad track, but if it could have moved them it seems to me it could not be compelled to do so. The railroad company voluntarily located its switch tracks in close proximity to a long-established business requiring a constant use of highly inflammable material. It did not condemn this property. Its location of the switch tracks there did not give defendant the right to drive the proprietors out of business, nor to force them to seek a new location, nor to compel them to bear the increased risk of fire caused by the location of the railroad tracks near them. I am of opinion it was not negligence for plaintiff to continue this business after the tracks had been located as it had been conducted before and was being conducted when the tracks were located there. I think there was no proof plaintiff had been guilty of contributory negligence, and therefore it was error to give said instruction No. 17, and it was calculated to mislead the jury.

Third. The court, at the instance of defendant, gave instruction No. 16, which, among other things, told the jury the law imposed upon defendant the duty of maintaining engines "equipped and supplied with the best known and most approved appliances in common use for arresting the escape of sparks therefrom, in the particular use to which such engines are put," and that when the railroad company had used due diligence and was without fault in the respects named in the instruction a loss by fire set by a spark escaping from an engine of the company, must fall on the owner of the property so destroyed. I think it was error to insert the qualification " in the particular use to which such engines are put." The rule was correctly stated without those

words.    The instruction told the jury the rule requiring the use of the most approved appliances for arresting sparks is modified by the use to which the engine is put.    I think the rule requiring the use of the best appliances is imperative and is not subject to any such modification, but if there is any modification arising from the use to which the engine is put this instruction does not tell the jury what effect the use to which the engine is put would have upon the rule. As it was an instruction telling the jury that certain things would exonerate the defendant and leave the owner to bear the loss, the jury might easily understand the instruction to mean that the railroad company was not required to have on its switch engines as good appliances as upon road engines. I think this can not be the law.    Switch engines go in and out about mills, factories and yards where much combustible material is found, and they often go in narrow ways.    They often go closer to property and into positions where they are more liable to set fires than engines upon the main line with a wide right of way free from buildings and inflammable material.    I think instruction No. 16 was calculated to mislead the jury.

Fourth.    It does not admit of serious question but that plaintiff's property was destroyed by fire communicated from defendant's locomotive engine No. 208, while it was being operated by defendant's servants.    By force of the statute a *prima facie* inference of negligence arises against defendant from this mere fact.    Defendant, to overcome this inference, was required to show among other things, that it had in use upon the locomotive the best and most approved appliances for preventing damages by fire, or as expressed in Chicago & Alton R. R. Co. v. Quaintance, 58 Ill. 389, " the best and most approved mechanical appliances" to " prevent the emission of fire sparks from locomotive engines."    Toledo, W. & W. Ry. Co. v. Larmon, 67 Ill. 68; Chicago & E. I. R. R. Co. v. Goyette, 133 Ill. 21.

Said engine, No. 208, was equipped with a " diamond stack."    Defendant offered proof to show it was the best and most approved appliance to prevent the escape of sparks.

Plaintiff offered evidence in rebuttal to show that the "extension front" was a much more effective spark arrester, and was so recognized and approved by railroad men generally. It would unduly extend the limits of this dissenting opinion to describe the difference between these appliances, save to say that in the diamond stack the cinders reaching the smoke stack are all carried by the draught out of the smoke stack at the top and dropped upon the ground near by, but they are first thrown against a steel cone upon which many of them are broken and ground up and their vitality destroyed; while in the extension front the great majority of the cinders are deflected from the draught and deposited in a receptacle at the bottom of the smoke stack where they lie until taken out at the end of the run; and those cinders and sparks which are not so deflected are thrown high into the air, and it is claimed they generally become dead before they reach the ground. Johann, defendant's superintendent of machinery, testified that an extension front will so deposit fifteen to twenty bushels of cinders in running from Chicago to Bloomington, a distance of 126 miles. It would seem that a contrivance which entirely prevents the escape of so large a portion of the cinders which reach the smoke stack, must be less liable to communicate fire than an appliance which forces all this material out of the top of the smoke stack, even if the cinders are first broken so fine as to pass through a screen.

Defendant called three of its employes as experts as to the relative value of these appliances, who did on direct examination testify that the diamond stack was as effective for the purpose of preventing the escape of fire as the extension front. But of these witnesses only one, Abrams, the engineer of No. 208 when this fire was set, adhered fully to that position on cross-examination. Van Horn on cross-examination said he supposed it was true the extension front was generally considered the best. Johann on cross-examination admitted that the extension front had largely superseded the diamond stack, and that in certain respects it is an improvement over the diamond stack. He

also admitted that on the trial of Glenny v. The Chicago & Alton R. R. Co. he testified that the extension front was the best engine known to him in common use; that it had superseded the diamond stack as a spark arrester; that it was the best known appliance for that purpose; and was in almost universal use. Beallis, the fireman of No. 208, described the difference between the two appliances, but did not express an opinion as to their relative values. On the other hand plaintiff called five expert witnesses, not connected with either party, each of whom declared the extension front was superior to the diamond stack as a spark arrester and as a preventive of fire, and each adhered to his position. Moreover, Heintzleman, one of defendant's engineers, and its witness, on cross-examination gave positive testimony to the same effect. There were therefore six positive witnesses testifying that the extension front was the best known appliance for preventing the escape of fire from a locomotive and was superior to the diamond stack for that purpose, as against one positive witness and two halting witnesses, employes of defendant, claiming the diamond stack was equal to the extension front. In addition to this was the very significant fact that for fifteen years the defendant had not purchased a single diamond stack nor equipped a single engine therewith, but that all engines it has bought or equipped during that period have been furnished with the extension front, and it has made over several diamond stacks into extension fronts during that time. It therefore seems to me that the great preponderance of the evidence is that at the time this fire was set the diamond stack was not the best known appliance for preventing the escape of fire from locomotives. But still further, the proof shows by defendant's own witnesses, that Johann, who came to defendant in 1892, introduced into the diamond stack a cone two inches wider across the top, and auger shaped, having a winding spiral groove; that this improvement causes the engine to throw less sparks than did the diamond stacks as previously in use, and that this improvement was not put on engine No.

208. Therefore it seems engine No. 208 was not equipped even with the diamond stack best fitted to arrest sparks.

Fifth. Did the crew having engine No. 208 in charge exercise due care at the time this fire was set? The evidence shows that defendant's engineers and switch crews who worked on the switch tracks knew the danger of working the engines hard near these straw stacks. When they had cars to set in on the straw track next to the stacks they never took the engine in at all but "kicked" the cars in. When they had cars to take out from the track they went in carefully with just enough steam to move the cars. Engine No. 208 that day had a heavy load to pull out from the mill switch track, and passed thirty feet from the stacks. There was a gale of wind blowing from the place where the engine had to pass toward the stacks. The train had to be pulled up a steep grade on a curve. The engine that day had about as heavy a load as it could draw up that grade on that curve. The engineer testified that when he had such a load he was accustomed to pull his engine "wide open" in going out of that place, and that he hauled this load out that day just as he was accustomed to do on other days. He testified that it occurred to him while he was doing this work that it was dangerous to run by these straw stacks. He excused himself on the ground that he was subject to the orders of the foreman of the switching crew, and that the foreman ordered him to go ahead with this load and he obeyed. The proof shows that when an engine is pulling hard it will throw more sparks than when hauling only a moderate load. I think it a reasonable inference from the evidence that if this crew had hauled half these cars over the canal bridge and then gone back for the others no fire would have been set. The crew took this train out just as if there had been no gale of wind blowing from the engine to the stacks liable to carry the sparks to the straw. I am disposed to hold this was not the exercise of due care under the circumstances of this particular case.

For the reasons stated I think the judgment should be reversed and a new trial granted.