## Chicago & Alton R. R. Co. v. The American Strawboard Co.

1. RAILROADS—*Defenses to Actions for Fires Communicated from Locomotives.*—Where, in a suit against a railroad company for destruction of property by fire, the proof shows the fire was communicated from a locomotive engine of defendant, if defendant defends on the

ground its engine was equipped with the best or most approved appliances to prevent the escape of fire, and that said appliances were in good repair, and the engine properly handled by a skillful engineer, the burden of establishing that defense by a preponderance of the evidence rests upon the defendant.

2. SAME—*Care Required in Adopting Appliances to Prevent Fires.*— A railroad company is not bound to purchase every new invention, or test every new device to prevent the escape of fire from its engines, nor to adopt appliances which are mere experiments; yet if the proofs show a device which it had not adopted upon the engine which set the fire was generally recognized, at the date of the fire, as the best and most approved device to prevent the escape of fire, a verdict that said engine was not equipped with the best and most approved appliances to prevent the escape of fire, will not be set aside for lack of proof, although said device had not been adopted many years, and railroads differed as to some of its details.

3. FIRES—*What is Not Negligence in Maintaining a Straw Stack Yard in Connection with a Paper Mill.*—Where plaintiff and its predecessors in business had occupied certain grounds as a straw stack yard in connection with a paper mill continuously for twenty-three years, it will not be negligence for it to continue to use its grounds as they have been so used, notwithstanding a railroad switch track near by, where the proof does not show said switch track was there when such use of said grounds was begun, but rather that the switch had been moved within four or five years.

4. EVIDENCE—*Memoranda of Weights Kept on Pieces of Paper— When Admissible.*—Where straw was weighed and put into stacks, and the weights were set down upon scale books or pieces of paper, and said weights were copied upon stack sheets, and the net weights there computed and set down, and the scale books and pieces of paper were not preserved and could not be found, and every person who weighed the straw and transferred the weights to the stack sheets, testified all the work done by him was done correctly, *held,* the stack sheets were admissible in evidence to show the weight of the straw in the stacks, in a suit to recover the value of the stacks after they had been destroyed by fire.

5. PRACTICE—*When a Motion to Exclude the Entire Evidence is Properly Denied.*—A motion to exclude the entire testimony of a witness is properly denied if some part of his testimony is competent; and such a motion does not raise the question whether some one item of his testimony was incompetent.

**Action to Recover for Property Destroyed by Fire.**—Appeal from the Circuit Court of Will County; the Hon. ROBERT W. HILSCHER, Judge, presiding. Heard in this court at the April term, 1900. Affirmed. Opinion filed October 8, 1900.

GEORGE S. HOUSE, attorney for appellant.

Hill, Haven & Hill, attorneys for appellees; Jones & Lusk, of counsel.

Mr. Justice Dibell delivered the opinion of the court.

The American Strawboard Company brought this action against the Chicago & Alton Railroad Company to recover the value of certain straw stacks and a straw stacker, alleged to have been destroyed by fire which negligently escaped from an engine of defendant.  The case was before this court and the Supreme Court in American Strawboard Co. v. Chicago & Alton Railroad Co., 75 Ill. App. 420, and 177 Ill. 513, where the pleadings are stated.  At a second trial plaintiff obtained a verdict for $15,140.60, and had judgment thereon.  Defendant appeals.

Defendant's main tracks are east of the canal at Lockport.  A switch crosses the canal and divides into two branches, one running southwest to wire mills and an oatmeal mill, and the other turning north, and then dividing again into three tracks; one running close to the stackyard of plaintiff, used to deliver car loads of straw to plaintiff, and called the straw track; another further west running to plaintiff's boiler house, used to deliver cars of coal to plaintiff and called the coal track; and still further west a third running to Norton's flour mill and beyond, with a spur to plaintiff's paper mill, which track is called the flour track.  West of this is the main track of the Atchison, Topeka and Santa Fe Railroad.  Defendant had an engine, No. 208, housed nights at its Joliet roundhouse, which was used in switching forenoons at Lockport and afternoons at Joliet.  On March 25, 1895, plaintiff had eighteen stacks of straw in its stack yards, and had about its stacks various appliances to extinguish fire.  Engine 208 came from Joliet in the morning, passed over the canal, did switching at the wire mills and oatmeal mill, and about 10 A. M., went upon the flour track to take out eight loaded and six empty cars standing there.  It passed south and hauled these cars across the canal.  It went within thirty or forty feet of the nearest corner of the most southern stack.  A very heavy

wind, amounting almost to a gale, as some witnesses put it, was blowing from the southwest and directly from the engine toward the stack, when the engine was nearest the stack. Very shortly thereafter, fire, or rather smoke at first, was discovered by a number of persons, seen at first at the foot of the stack, then five feet up, then ten feet up, and rapidly enveloping the west end of the stack. The fire spread to and destroyed all the stacks, and two straw stackers, notwithstanding efforts by plaintiff's servants and the public authorities to extinguish it. Besides the general verdict for plaintiff, the jury returned special verdicts to the effect that the fire which consumed plaintiff's stacks and straw stackers was communicated from engine 208; that said engine was not at the time of the fire supplied with the best and most approved appliances in common use for preventing the escape of fire, but that it was at the time of the fire skillfully and carefully handled and operated to prevent the escape of fire. Defendant argues the proof did not show engine 208 set the fire; that the proof did show it was equipped with the best and most approved appliances in common use to prevent the escape of fire, and that they were in perfect repair; that plaintiff was negligent in stacking its straw so near the switch track and is thereby precluded from recovering; and that the proof offered by plaintiff to show the quantity of straw in the stacks was incompetent.

1. Did engine 208 set the fire? From the point where the engine started with these cars to the canal was an up grade and a reverse curve. The curves and up grade made it hard pulling. The foreman of the switching crew testified he had a very heavy load for that track and that an engine throws considerable more sparks when working hard and that because of the load, the up grade and the curves, the engineer found it necessary to use and did use all the steam the engine carried. As the engine passed the corner of the stack thirty or forty feet distant a very heavy wind was blowing directly from the engine toward the stack, and it blew the smoke of the engine against the stack. On the

side toward the wind there was no building nearer than the oatmeal mill on the other side of the river and a half a mile away. The foreman of this switching crew testified that as he went back on the flour track a construction train passed north on the Santa Fe railroad, and it is suggested this may have set the fire. The proof shows that three minutes before or after ten o'clock A. M., a passenger train left Lockport going south on the Santa Fe road. That is a single track road, and no train could have thereafter gone north till after that passenger train reached Joliet. Two witnesses walking north on the Santa Fe track met the passenger train a mile and a half south of the paper mill, and continued to walk north on the track till they were opposite the stack yard, when they saw the fire just breaking out. They do not speak of any train going north. The foreman of the switching crew says the fire broke out between 10:15 and 10:30. He made a report to his company giving the time when he discovered the fire at five or ten minutes after 10:20. It is evident the fire could not have been set by the Santa Fe passenger train, because of the time which had elapsed, and that no construction train passed north after the passenger train went south up to the time the fire broke out. But the nearest point of the Santa Fe track to the place where the stack caught fire was 365 feet, and its track southwest of the stack and in the direction of the wind was about 700 feet distant. The jury might well find the fire was set by an engine laboring heavily thirty or forty feet distant, rather than by an engine either 365 or 700 feet distant. No other source of fire but an engine is suggested by any witness. When all the evidence on the subject is considered, we think the only reasonable conclusion is that engine 208 set this fire. This made a *prima facie* case of negligence against defendant under the statute.

2. To overcome this *prima facie* case, defendant undertook to show that engine 208 was equipped with the best and most approved appliances in common use to prevent the escape of fire, and that they were in good repair and

properly handled.   The burden of establishing that defense
by a preponderance of the evidence rested upon defendant.
The engine had a diamond stack.   It was claimed by plaint-
iff that another device, known as the extension front end,
was a better and more approved appliance to prevent the
escape of fire.   The proof shows that every cinder or spark
which passes from the fire box to the draft of a diamond
stack must go out of the top of the stack and be deposited
on the ground, though the cinders are first thrown violently
against a steel cone, which tends to break them into finer
particles and drop them to the bottom of the stack, where
they are again caught by the draft and thrown out of the
top of the stack; but they are thrown sideways and with-
out great force.   In an extension front the cinders are
thrown against a perforated steel sheet or a wire net, which
is designed to deflect them from the route of the draft,
and all cinders so deflected are deposited in a large recep-
tacle in the front end, where the fire dies out.   Several
bushels of cinders are so deflected and their vitality
destroyed in a run of a hundred miles.   This device does
not deflect all the cinders, but the proof tends to show that
those which escape the sheet or net are thrown much higher
than cinders from a diamond stack, and are much more
likely to lose their vitality before reaching the ground than
those thrown less high, and with a sidewise motion, from
a diamond stack.   We think the clear preponderance of the
evidence is that the extension front is generally regarded
among railroad men as the superior contrivance to prevent
the escape of fire from the smoke stack.

Defendant, however, argues that in 1895 the extension
front was in an experimental stage.   A railroad is not
bound to purchase every new invention, nor to test every
new device that is offered, nor to adopt appliances that are
mere experiments.   But the proof does not warrant the
claim that in 1895 the extension front was a mere experi-
ment.   The diamond stack had been in use over forty
years.   The extension front was adopted by at least one
leading railroad in 1885, and by several others soon after.

The proof is that in 1895 it was the stack chiefly used on all leading railroads except the Union Pacific. It was the stack then used by defendant on about two-thirds of its engines. It is true different railroads used different kinds of sheets or nets in their extension fronts to deflect the cinders from the line of the draft, and some, after using one form of sheet or net, changed to another. But these differences and changes did not relate to the main feature or principle of the extension front, which was to prevent the cinders from passing out of the smoke stack by turning them aside from the strong draft which passes up that conduit, and depositing them in a large receptacle, where they lie till fire is extinct and till removed by mechanical means. The preponderance of the evidence is that this principle was in common use by the railroads of the country before 1895, and was then generally recognized as the best and most approved device to prevent the escape of fire from locomotive engines. Whether the cinders should be deflected by a perforated steel sheet or by a wire net, and what should be the width and length of the perforations or the size of the meshes, may have been the subject of experiment and improvement, but these were mere matters of detail, not affecting the principle of the device. A railroad is not excused from using the best device to prevent the escape of fire because others are seeking to further improve it and to make it still more effective.

Aside from the question of the smoke stack, there was proof tending to show another defect in this engine at the time of the fire. It is in proof that there should be two dampers upon the ash box or pan of a locomotive engine, one in front and one in the rear; that without them fire is liable to drop from the ash pan after the grates have been shaken, or when the motion of the engine has caused fire to fall through the grates; and that an engine without dampers or screens upon the ash box is not equipped with the best or most approved appliances to prevent the escape of fire. It is customary when running to keep one of the dampers open to aid the draft, but there are appliances inside the

cab by which the engineer or fireman may close the dampers when at a place where fire is liable to catch. Sometimes engines are built with a screen or netting or grate in front of each damper opening, as an additional protection from the escape of fire. There were no screens, netting or grates in front of the openings to the fire box on engine 208. Plaintiff claimed there were also no dampers upon it. Two witnesses who were in a position to know with certainty, testified that on the day of the fire engine 208 had no dampers. They were corroborated to some extent by other witnesses. Two other witnesses who were equally in a position to know with certainty, testified that on the day of the fire, both dampers were on engine 208. They were also corroborated to some extent by other witnesses. It was the special province of the jury to determine that question from the evidence. Plaintiff also offered evidence tending to show this fire may have been set by this defect in the fire box.

The testimony relating to the merits of the several smoke stacks and to the condition of the fire box as to dampers, was very voluminous, and it would unduly extend this opinion to repeat it here. We have carefully considered it all, and we can not say that defendant showed by a preponderance of the evidence that engine 208 at the time of the fire was equipped with the best and most approved appliances in common use to prevent the escape of fire, nor that the jury erred in finding specially it was not so equipped; nor that another jury on the same evidence would be likely to find the other way.

3. Part of plaintiff's stacks stood within the limits of Daviess street, as platted, and the fire caught there. Defendant's straw track was within the limits of that street, west of the stacks, and it was there by permission of the public authorities. The straw track and the coal track seem to have been built to enable defendant to do business with plaintiff by delivering cars of straw and coal at its yards. Defendant argues plaintiff was a mere trespasser in the street and therefore not entitled to the protection of

the statutes relating to the setting of fire by railroads, and that plaintiff can not complain of tracks built for its accommodation. When engine 208 set this fire, it was not on the straw track nor on the coal track, and it is not material to this case whether those tracks were built for the mutual benefit of both parties, nor that defendant had acquired a right to place those tracks where they were. The engine was on the flour track, and hauling out a train which had no connection with plaintiff's business. The claim that plaintiff was a trespasser in stacking within the limits of a platted street, and was guilty of negligence in stacking this straw so near the railroad tracks, seems to be a re-assertion of positions determined against defendant by the opinion of the Supreme Court in this case. The proof shows Daviess street as platted had not been traveled by the public, but a way had been opened east of the first tier of stacks, and across plaintiff's lots, which the public traveled, and that the public authorities maintained a bridge across the spillway on that line, and off the line of Daviess street. Several witnesses testified the paper mill was built in 1871 or 1872, and that this ground was from that time occupied as a place for stacking straw for the paper mill. One witness testified that he built the first stack in 1872 on the ground where this fire occurred. Plaintiff has a carrier near the stacks to conduct the straw to the mill when needed. This yard is intended for the storage of straw not needed for immediate use. Formerly it was stacked loose, and now in bales. The use of this land for stacks has passed with the ownership of the paper mill from the original proprietors to plaintiff. The present record does not seem to show definitely when defendant's switch tracks were first located in that vicinity, but they were entirely changed south of Fourteenth street in 1890 or 1891, and this fire started south of Fourteenth street. There is no proof there were any switch tracks in that vicinity when plaintiff's predecessor first occupied this ground for its stack yard, and no negligence by plaintiff, therefore, is shown in stacking its straw on this ground in 1895, as it and its predecessors in

ownership of the mill and possession of the stack yard, had continuously done for twenty-three years before the fire.

4.   To show the quantity of straw destroyed by the fire plaintiff introduced much oral evidence, and in connection therewith eighteen stack sheets, being for stacks numbered one to nineteen inclusive, except numbers twelve and thirteen, there being two stacks number three, one for ordinary straw and one for new wheat straw.   To these eighteen stack sheets defendant objected, " except in so far as Mr. Van Horn himself put down the weight of the straw by him weighed."   This objection was overruled, the defendant excepted, and it is now argued it was error to admit these stack sheets.   After this ruling had been made plaintiff recalled two witnesses and examined them at considerable length as to the manner of making these sheets and as to their accuracy.   The record does not disclose when, if ever, they were read to the jury or placed in their hands, but they are set out in the bill of exceptions after this additional proof had been heard, and no objection to them was then made.   We may reasonably assume (in the absence of any statement on the subject) that they were not read or delivered to the jury till that point in the trial was reached where they are set out, and at that time considerable additional proof had been offered to make them competent, and no objection was then made.   The object of recalling these witnesses was to obviate the objection previously made.   If the court erred in ruling to admit the sheets when objection was made, still the additional proof thereafter heard made a new case as to their competency, and no objection was thereafter interposed.   We, however, proceed to consider the competency of the stack sheets, as if the record presented the question.

In the manner in which plaintiff conducted its business a separate sheet was kept for each stack, and when plaintiff used the stack the sheet was destroyed.   It was a plan devised by plaintiff to show it the contents of each stack and from what sources derived.   The full sheet provided for the date of each separate weighing of straw which was put into the

stack, the gross weight of straw and car or wagon, the tare, or weight of the empty car or wagon, the number of the car, number of bales, length of car, kind of straw, net weight and remarks. About half the entries on these sheets were fully filled out, and the others omitted gross weight and tare but gave the net weight. The weight of the loose straw used in topping the stack was set down at the bottom of the sheet, and the total number of tons in that stack was then computed and set down. Yost weighed upon car scales set in the straw track, all straw which came over the Chicago & Alton. He set down the weights in a little book. He often had the stack sheets there before him, and in such case generally at the time of weighing also set down the weights on the sheet. The straw which came over the Santa Fe was hauled in wagons to the office and there weighed on wagon scales and then taken to the stack, and the gross weight and tare were set down on a scale book or on a piece of paper. The loose straw was bought of farmers in wagon loads, and weighed on the wagon scales in the same way. Van Horn did the weighing at the wagon scales when he was present, as he usually was, and when he was absent, Sager, superintendent of plaintiff's Lockport mill, did that weighing. Whichever did the weighing set down the figures. These details were all carried onto the proper stack sheet, and the extensions were there made. Sometimes each person posted to the sheet the entries he had made on the scale book or piece of paper, and sometimes one posted entries made by the others, and in each such case the party posting knew the writing of the person who had made the original notation. No one did any weighing, or made any entries on the scale books or pieces of paper or stack sheets, except Yost, Van Horn and Sager. Each of them testified all the entries he made and all the work he did in making entries and in posting, was done correctly. Van Horn, who was plaintiff's bookkeeper, went over all the extensions carefully, and testified they were correct. The straw was paid for by these figures. The scale books and pieces of paper upon which the weights were originally

noted, were not preserved or treated as important after the stack sheets were made, and upon diligent search in all places where they were accustomed to be kept they could not be found.

These stack sheets were in effect inventories of the quantities of straw in the several stacks destroyed, and the testimony of Yost, Van Horn and Sager, when all considered, shows they were correct inventories, and correctly made up from the original notations, and that the latter had been lost or destroyed. It is only by such testimony the quantities of goods destroyed by fire can usually be proved, for no witness can carry such numerous details in his memory. When the persons who made such statements testify they made them correctly, the papers so made are admissible in evidence. In Insurance Companies v Weides, 14 Wall. 375, the owners of a stock of goods destroyed by fire proved they took a correct inventory at a certain date; that the inventory was reduced to writing in an inventory book; that the prices or values were correctly footed therein; that the footings were correctly copied upon the flyleaf of an exhausted ledger, and afterward transferred to the flyleaf of a new ledger; that the inventory and exhausted ledger had been destroyed, and that none of the witnesses could remember the amount of the inventory or footings. It was held the entry of the footings on the flyleaf of the new ledger was competent evidence in connection with the oral testimony. It was there said that it had been many times decided that such papers, accompanied by such proof, are receivable in evidence.

But if the stack sheets had been incompetent, their admission would not be reversible error in this case, for their only office was to prove the number of tons of straw in the stacks destroyed, and that was also shown by oral evidence to which no objection was interposed. Van Horn, when on the stand the first time, testified fully as to the number of tons in each stack, and this without objection. During the cross-examination defendant made two motions to exclude. The abstract says each was a motion "to

exclude the testimony of this witness as to the weight of the straw," but this is incorrect. In the record each motion was simply to exclude the testimony of the witness. Van Horn had testified at length concerning the origin of the fire, the efforts to extinguish it, the number of stacks and stackers destroyed, and other matters clearly competent. The motions to exclude his entire testimony were properly denied, and under such a motion the question does not arise whether some one item of the witness' testimony was incompetent. Therefore this oral testimony of the contents of each stack and of the total number of tons destroyed went to the jury without objection. There was other oral proof by Yost of the approximate number of tons in these stacks. Yost was very familiar with the stacks as he was working around them constantly. There was no evidence to contradict this proof. The value of the straw per ton was stated by several witnesses, and was not disputed. The oral testimony which went in without objection was sufficient to support the verdict. There was also oral proof, received without objection, of the width of each stack at the bottom, both in bales and in feet, the number of bales in height the stack was carried up at that width, the manner in which the stack was then drawn in, half a bale at a time on each side, till the top was two bales wide; how it was topped out, the approximate length of the stacks, the average weight of a bale of straw, and the value of the straw in the stack per ton. This furnished data from which the jury could compute with substantial accuracy the contents of the stacks and the value of the straw destroyed. Each count of the declaration declared for one stacker destroyed. The proof showed two were destroyed, worth twenty to twenty-five dollars each. The jury seem to have allowed for 3,476 tons at $4.35 per ton, or $15,120.60, and for one stacker at twenty dollars, as their verdict was $15,140.60. We have patiently investigated the evidence in the record as well as the abstract, and conclude it warrants the verdict.

5. Defendant in its argument says certain instructions

given for plaintiff should have been refused, and those requested by defendant and refused should have been given, but does not point out the defects in plaintiff's instructions, nor discuss defendant's refused instructions, except as they are indirectly involved in the discussion of the evidence. As defendant has not discussed any of the instructions in detail we deem it unnecessary to do so, but think it sufficient to say that the instructions given for plaintiff appear to conform to the views expressed by the Supreme Court when this case was before it; that most of defendant's refused instructions are not in harmony with the views expressed by the Supreme Court; and that so far as said refused instructions were correct, they are embodied in the other instructions which the court gave at defendant's request, and it was not necessary to repeat them.

The judgment is affirmed.